## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| **FRED PONDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | |
| **v.** | ) | **1:16-cv-04125-ODE-LTW** |
| | ) | |
| **OCWEN LOAN SERVICING** | ) | |
| **LLC, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR A PROTECTIVE ORDER

COMES NOW Plaintiff, Fred Ponder by counsel, and files his Memorandum Opposition to Defendant's Motion for a Protective Order, and shows this Court the following:

## BACKGROUND

This case arises because Ocwen, while servicing the Plaintiff, Fred Ponder's mortgage account, refused to correct inaccurate reporting on two separate trade lines in Mr. Ponder's credit report indicating a default on his mortgage, refused to investigate Mr. Ponder's notices of error sent to Ocwen, failed to respond to qualified written requests for documents and information, and knowingly engaged in abusive collection practices on Mr. Ponder's mortgage account. Ocwen acquired servicing rights to Mr. Ponder's mortgage when it acquired Litton Loan Servicing in 2011. See 2012 Consent Order entered between the New York State Department of

1

Financial Services ("NYSDFS ") and Ocwen attached hereto as Ex. A, p. 1. The claims and defenses in this action relate to Defendant's violations under the Real Estate Settlement Procedures Act ("RESPA"), the Fair Credit Reporting Act ("FCRA"), and the Fair Debt Collection Practices Act ("FDCPA"). The subpoenaed documents all stem from an investigation conducted due to NYSDFS's concerns regarding Ocwen's rapid growth and capacity to properly acquire and service a significant portfolio of distressed home loans:

> [I]n connection with Ocwen's acquisition of Litton and amid concerns regarding Ocwen's rapid growth and capacity to properly board a significant portfolio of distressed home loans, Ocwen and the New York State Department of Financial Services… entered into an [a]greement…, which required Ocwen to; (1) establish and maintain sufficient capacity to properly board and manage its significant portfolio of distressed loans; (2) engage in sound document execution and retention practices to ensure that mortgage files were accurate, complete, and reliable; and (3) implement a system of robust internal controls and oversight with respect to mortgage servicing practices performed by its staff and third-party vendors…

Ex. A, pp. 1-2; See also the  NYSDFS and Ocwen 2014 Consent Order attached hereto as Exhibit B, p. 2 ( "Agreement on Mortgage Servicing Practices… required Ocwen to adhere to certain servicing practices in the best interest of borrowers and investors."). Prior to the agreement "a multistate examination of Ocwen… identified, among other things, deficiencies in Ocwen's servicing platform and loss mitigation infrastructure, including (a) robo-signing, (b) inaccurate affidavits and failure to properly validate document execution processes, (c) missing

documentation, … [and] (e) failure to properly maintain books and records…" Ex. B, p. 3. Further, "[t]he examination of Litton also revealed that, prior to Ocwen's acquisition of Litton, members of Litton's information technology staff falsified documents provided to the Department during the review of Litton's information technology infrastructure. Ex. A, p. 1.

On June 13, 2012, the NYSDFS conducted a targeted examination of Ocwen to assess its compliance with the aforementioned agreement and determined that Ocwen had failed to implement "policies and procedures to verify borrower information on newly boarded accounts to accurately reflect the status and current balance of the borrower's account…" Ex. A, pp. 1 & 4. This admission by Ocwen is signed by its then President and CEO Ronald M. Faris. Ex. A, p. 9. "The targeted examination also identified instances that indicated… (b) dual-tracking… and (f) failing to ensure that trial or permanent modifications granted to borrowers by a prior servicer are honored upon transfer to Ocwen." Ex. B, pp. 4-5.

The parties agreed that Ocwen would hire a Compliance Monitor to conduct a comprehensive review of Ocwen's servicing operations and operational policies and procedures, compliance with state and federal law, the accuracy of borrower account information, and borrower complaints, among other topics. Ex. A, pp. 4-6, and Ex. B, p. 5. The Department and the Compliance Monitor identified numerous and significant additional violations of the 2011 Agreement. Ex. B, p. 2. Further,

"[t]he Department and the Compliance Monitor… identified, among other things,

(a) inadequate and ineffective information technology systems and personnel, and

(b) widespread conflicts of interest with related parties." Ex. B, p. 6.

> … Ocwen's information technology systems are a patchwork of
> legacy systems and systems inherited from acquired companies, many
> of which are incompatible… a fix to one system creates unintended
> consequences in other systems.

Ex. B, p. 6.  "As a result, Ocwen regularly gives borrowers incorrect or outdated

information, sends borrowers backdated letters, unreliably tracks data for investors,

and maintains inaccurate records. There are insufficient controls in place— either

manual or automated—to catch all of these errors and resolve them." Ex. B, p. 6.

Further, "Ocwen's systems have been backdating letters for years." Ex. B, p. 6.

> Ocwen's core servicing functions rely on its inadequate systems.
> Specifically, Ocwen uses comment codes entered either manually or
> automatically to service its portfolio; each code initiates a process,
> such as sending a delinquency letter to a borrower, or referring a loan
> to foreclosure counsel. With Ocwen's rapid growth and acquisitions
> of other servicers, the number of Ocwen's comment codes has
> ballooned to more than 8,400 such codes. Often, due to insufficient
> integration following acquisitions of other servicers, there are
> duplicate codes that perform the same function. The result is an
> unnecessarily complex system of comment codes, including, for
> example, 50 different codes for the single function of assigning a
> struggling borrower a designated customer care representative.

Ex. B, p. 7. "Despite these issues, Ocwen continues to rely on those systems to

service its portfolio of distressed loans" leading "it to employ fewer trained

personnel than its competitors", and hiring "offshore customer care personnel, that

Ocwen is simply… training… to read the scripts and the dialogue engines with feeling." Ex. B, p. 7-8. Additionally, Ocwen agreed to have in place an Operations Monitor who would thoroughly review its operations and submit monthly action reports and quarterly Operation Reports, during the relevant period within the statutes of limitations of this case. Ex. B pp. 11-15. The scope of these reports includes "[i]nformation technology systems and personnel, including with respect to record keeping and borrower communications, "[n]umber of personnel and the training and expertise of its personnel in all servicing operations", "[o]nboarding process for newly acquired mortgage servicing rights, including Ocwen's ability to onboard newly acquired MSRs without interruption to servicing newly acquired loans or its existing loan portfolio", [c]ontrols in identifying and correcting errors made by Ocwen's personnel or systems", [r]isk management functions", [c]ontracts or proposed contracts with third parties, including but not limited to related parties, "Ocwen borrower experience, "Determinations as to whether Ocwen's servicing, compliance, and information technology functions are adequately staffed", "Determinations as to whether Ocwen's servicing, compliance, and information technology personnel are adequately trained", "Determinations as to whether Ocwen's information technology infrastructure and ongoing investment in information technology systems are adequate", "Determinations as to whether Ocwen is adequately addressing the issues identified by the Operations Monitor and

the Compliance Monitor", "[t]he development and implementation of a plan to resolve record-keeping and borrower communication issues", "[t]he development and performance of a risk assessment to identify potential risks and deficiencies in the onboarding process". Ex. B pp. 11-15. As is shown from Mr. Ponder's story, below, these records are highly relevant to his claims.

While Mr. Ponder fell behind on his mortgage payments way back in 2005, he was able to catch his account up by February of 2009. See a copy of Litton's ledger attached hereto as Ex. C. Then, on March 11, 2009, Litton reversed payments for eight months of payments, applied late fees for each of these dates, and applied the balance to itself for what it input to its ledger as "Recovery of ES Adv from Borrower." Ex. C. Further, Litton's ledger is full of bogus fees for services that are unexplained, and for which Ocwen cannot or will not provide an explanation, such as "LENDER PLACED FIRE." Ex. C.

Defendant has also failed to respond to multiple qualified written requests, failed to investigate notices of error, and continued to report the account as a double trade-line report. Despite Mr. Ponder disputing Ocwen's errors directly to Ocwen, then through the consumer reporting agencies, Ocwen continued to falsely report just about the worst thing that could appear on a consumer's report: a defaulted mortgage. See July 25, 2015 Trans Union Credit Report attached hereto as Ex. D,

bates stamp TU 16. In fact, Ocwen reported two defaulted mortgages. See Ex. D TU 16-TU 17.

Under RESPA, Mr. Ponder has a cause of action pursuant to 12 U.S.C. 2605(f). Pursuant to Section 2605(e), Mr. Ponder sent documentation to Ocwen indicating that he had been paying his mortgage as required and disputing any delinquency on his account, including the assessment of late charges and other default fees. He asked that they remove the delinquency and investigate his claims. Ocwen did not 1) make any corrections to the account, 2) conduct any investigation to his claims, 3) provide Mr. Ponder any written explanation regarding his request or 4) cease its delinquent credit reporting during his disputes, despite their obligations under Section 2605(e)(2) and (3) until Mr. Ponder filed a complaint with the CFPB.

There are three primary claims available to a consumer under the FCRA when inaccurate information is published about him. The first two causes of action arise under 15 U.S.C. §1681e(b) and 15 U.S.C. §1681i and only apply to "consumer reporting agencies" (CRAs), most commonly Equifax, Experian and Trans Union. The third type of FCRA claim applies to furnishers such as Ocwen, and is codified at 15 U.S.C. §1681s-2(b). In 1996, Congress amended the FCRA to add §1681s-2, imposing on "furnishers of information" to credit bureaus detailed and specific responsibilities, including the consumer dispute procedures stated in subsection (b).

A simplified summary is that 1681s-2(a) contains substantive and procedural requirements limiting how a creditor may report a debt to the credit bureaus. However §§1681s-2(c) and (d) do not provide any private cause of action for such violations. That leaves §1681s-2(b) as the consumer's principal remedy against a creditor's inaccurate reporting. This subsection applies only when a consumer makes a dispute through the credit bureaus and requires the creditor to conduct a "reasonable investigation" and to accurately report the results of that investigation back to the bureaus.  Mr. Ponder alleges that the Defendant violated both of these requirements.

Additionally, the records relate to Mr. Ponder's claim that Defendant is a debt collector under "debt collector" under 15 U.S.C. § 1692a of the FDCPA because the acquisition of servicing rights on the mortgage, and whether Defendant treated the loan as in default, are directly at issue to answer that question, which is a necessary element of any FDCPA claim.

## **ARGUMENT AND CITATION TO AUTHORITY**

Rule 26(c)(1) allows for a protective order precluding any type of discovery "for  good  cause  shown." The  party requesting a protective order must  make  a specific demonstration of facts in support of the request, rather than conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one. E.g., In re PE Corp. Sec. Litig., 221 F.R.D. 20, 26 (D. Conn.

2003). A court must balance the competing factors involved in determining whether good cause has been shown. See Farnsworth v. Procter & Gamble Co., 758 F.2d 1545, 1547 (11th Cir.1985). Defendant Ocwen has failed to meet its burden, so Ocwen's motion should be denied based on that alone.

However, if a sufficient showing of good cause is found, and the Court forgives the failure to meet and confer, the burden then shifts to the nonmoving party to show why relief should still not be granted, either because of undue prejudice or the importance of the discovery at issue. E.g., Wiggins v. Burge, 173 F.R.D. 226, 229 (N. D.Ill.1997) ("In deciding whether good cause exists, the district court must balance interests involved: the harm to the party seeking the protective order and the importance of the disclosure"); Cummings v. General Motors Corp., 353 F.3d 944, 954 (10th Cir.2004) (it is not enough that the discovery be burdensome; that burden must be "undue").

## I.   Defendant's motion should be denied for Failure to Meet and Confer.

Because Defendant failed to comply with its meet and confer duties, its motion should be denied. See Fed. R. Civ. P. 26(c)(1) ("A party ... may move for a protective order.... The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action."). Defendant did not attach the required certification, and could not have done because Defendant did not attempt to meet

and confer with Plaintiff in the thirty days that followed the notice of the subject subpoena. Instead, Defendant waited until 7:53 pm, the day before the production was required, giving this Court no time to review it, and filed its motion. Given Defendant's failure to follow this most basic of requirements to obtain a protective order, Defendant's motion should be denied.

## II. Plaintiff does not contest that Ocwen has standing to seek a protective order, but Plaintiff does not have standing for its motion to quash argument.

In the Eleventh Circuit, "standing exists if the party alleges a 'personal right or privilege' with respect to the subpoenas." Auto-Owners Ins. Co. v. Se. Floating Docks, Inc., 231 F.R.D. 426, 429 (M.D. Fla. 2005). Thus Defendant may motion to quash Mr. Ponder's subpoena by exerting a personal right or privilege with respect to the subject subpoena. However, Defendant has chosen to assert others' personal rights and privileges, which it cannot do.

Besides relevance, the only argument that Defendant makes for standing is then abandoned by Defendant. Defendant seeks to assert a right or privilege based upon the fact that it has objected to producing some of the documents requested in the subpoena. Defendant seeks to exclude all requested documents on the basis that some of them have already been requested from Defendant. The Requests to which Ocwen refers are numbers 27 and 28 of Mr. Ponder's Second Request for Production of Documents.

REQUEST FOR PRODUCTION 27. Produce all reports by the Compliance Monitor identified in ¶9 of the Consent Order attached as Exhibit "A." [Exhibit A to the requests is Exhibit 2 attached to the Memorandum]

ANSWER: See Response to Request No. 26.

REQUST FOR PRODUCTION 28. Produce all reports by the Operations
Compliance Monitors generated pursuant to the Consent Order attached as Exhibit "A."

ANSWER: See Response to Request No. 26.

However, Defendant has not properly preserved the purported controversy for this Court's attention. Fed. R. Civ. P. 34(b)(2)(C) requires that "[a]n objection must state whether any responsive materials are being withheld on the basis of that objection" and "[a]n objection to part of a request must specify the part and permit inspection of the rest." Further, Defendant did not "state with specificity the grounds for objecting to the request, including the reasons…" Fed. R. Civ. P. 34(b)(2)(B). Defendant has failed to properly object under Rule 34. Further, the cited objection is boilerplate and fails to indicate whether any responsive documents exist. The Eleventh Circuit, in no uncertain terms, has stated that such conclusory objections cannot form the basis for protective orders:

> To be adequate, objections which serve as the basis of a motion for protective order under Fed.R.Civ.P. 26 should be "plain enough and specific enough so that the court can understand in what way the interrogatories are alleged to be objectionable." *Davis v. Fendler,* 650 F.2d 1154, 1160 (9th Cir.1981). *See Josephs v. Harris Corp.,* 677 F.2d 985 (3d Cir.1982) (quoting *Roesberg v. Johns-Manville Corp.,* 85

F.R.D. 292, 296–97 (E.D.Pa.1980)) ("party resisting discovery 'must show specifically how ... each interrogatory is not relevant or how each question     is overly broad, burdensome or     oppressive....'     ").

… The subsidiary question, therefore, is whether appellees' motion for a     protective     order contained sufficiently specific objections.

Panola Land Buyers Ass'n v. Shuman, 762 F.2d 1550, 1558-59 (11th Cir. 1985).

Objections that discovery was unnecessary, too long, too broad, require too much time, are expensive to complete, are irrelevant, are improperly timed, and entail unreasonable geographic compliance with no mention of the Rule 26(b) factors with "sufficient specificity to allow the magistrate and the district court, absent an abuse of discretion, [forms no basis] to grant the motion for a protective order." Id. at 1559. The Court also determined that the recitation of expense and burdensomeness were merely conclusory. Id. Defendant's objection to 26, though not properly made to Plaintiff's requests 27 and 28, is just the sort of objection that the Eleventh Circuit described as lacking sufficient specificity to allow the Court to grant a protective order, and merely conclusory:

Ocwen objects to this Request on the grounds that it is overly broad, unduly burdensome, not reasonably limited in time and scope, and because it commands the disclosure of documents and information that are neither relevant to the issues that are the subject of this lawsuit, nor reasonably calculated to lead to the discovery of evidence admissible in this case. Ocwen objects that this Request seeks documents and information from a third party and that is grossly disproportionate to the 3 statutory claims at issue before this Court. Ocwen objects because the discovery sought has absolutely no bearing whatsoever on the determination of Ocwen's liability to Plaintiff in this action under RESPA, the FDCPA or the FCRA. Ocwen further objects that the time

> period at issue in 2011 falls far outside the statute of limitations of the
> claims at issue. Finally, Ocwen objects that state and federal laws
> prohibit the disclosure of confidential financial information belonging
> to other individuals in these circumstances, which do not warrant such
> disclosures. Plaintiff is on an improper fishing expedition which
> violates the spirit and rules of discovery.

Defendant failed to properly assert a privilege, so it cannot now rely on same. In

order to withhold information otherwise discoverable, Defendant had to expressly

make a claim and describe the evidence being withheld. See Fed. R. Civ. P.

26(b)(5)(A). Likely because Defendant's objections and responses are inadequate,

Defendant does not assert its privileges or this discovery dispute as the reason to

grant this protective order, but—instead—argues relevance, and non-parties'

privileges under New York, Georgia, and Federal Banking Law. Aside from

relevance, Defendant's purported standing is divorced from its arguments, so

Defendant should be understood to only be properly bringing its motion on the basis

of relevance. However, Mr. Ponder addresses each argument below.

### III.   Mr. Ponder's Subpoena seeks Relevant evidence.

> Federal Rule of Evidence 402 states: "All relevant evidence is
> admissible, except as otherwise provided by the Constitution of the
> United States, by Act of Congress, by these rules, or by other rules
> prescribed by the Supreme Court pursuant to statutory authority.
> Evidence which is not relevant is not admissible."

Thus, in a class action case pending against Ocwen in the Eastern District of

New York, the Court found Ocwen's relevance argument without merit

13

because "[t]he very reason NYDFS began investigating Ocwen's practices

closely was because it

> ha[d] consumer protection concerns relating to practices highlighted in
> the media that have been prevalent in the mortgage servicing industry
> generally, including but not limited to, the practice of "Robo-signing,"
> referring to affidavits in foreclosure proceedings that falsely attest that
> the signer has personal knowledge of the facts presented therein and/or
> were not notarized in accordance with state law; weak internal controls
> and oversight that may have compromised the accuracy of foreclosure
> documents; unfair and improper practices in connection with loss
> mitigation, including improper denials of loan modifications; and
> imposition of improper fees by servicers, amongst others.

Harte v. Ocwen Fin. Corp., No. 13-CV-5410, 2018 WL 1830811, at *15 (E.D.N.Y.

Feb. 8, 2018), report and recommendation adopted, No. 13CV5410MKBRER, 2018

WL 1559766 (E.D.N.Y. Mar. 30, 2018). As is shown below these investigations and

the monitor reports are highly relevant to Mr. Ponder's claims and Defendant's

asserted defenses.

> a. Plaintiff seeks documents related to whether Defendant could verify the
> information it repeatedly reported on Plaintiff from 2011 through 2016.

There are two categories of disputed information that Plaintiff disputed as

inaccurate that are at issue in this case. Plaintiff disputed Defendant's double

reporting of his mortgage, and Plaintiff disputed Defendant's report that he was in

default, including the balance reported legacy fees and penalties assessed by Litton

prior to Ocwen's assumption of servicing duties on the account. § 1681s–2(b)(1)

requires creditors, after receiving notice of a consumer dispute from a credit

reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified. See Hinkle v. Midland Credit Mgmt., Inc., 827 F.3d 1295, 1302 (11th Cir. 2016) (stating that "reasonableness" is an appropriate touchstone for evaluating investigations under § 1681s–2(b). Hinkle v. Midland Credit Mgmt., Inc. was the case of first impression in the Eleventh Circuit of what constitutes a "Reasonable Investigation" by a credit furnisher, and its facts were similar to the case at hand in that the defendant, Midland Credit Management, Inc., much like Defendant Ocwen in the present case, had acquired a loan that was purported to already be in default and then relied solely on the records in its file to verify its credit reporting. In holding that Midland had not conducted an adequate investigation, the Court stated:

> § 1681s–2(b) requires some degree of careful inquiry by furnishers of information. In particular, when a furnisher does not already possess evidence establishing that an item of disputed information is true, § 1681s–2(b) requires the furnisher to seek out and obtain such evidence before reporting the information as verified." *See id.* at 431 (reversing summary judgment because a reasonable jury could find a violation of § 1681s–2(b) where the furnisher **"d[id] not look beyond the information contained in the [internal data file] and never consult[ed] underlying documents such as account applications"**); *cf. Cahlin*, 936 F.2d at 1160 (observing that a claim for failure to investigate "is properly raised when a particular credit report contains a *factual* deficiency or error that could have been remedied by uncovering additional facts"). The requirement to uncover additional facts will be more or less intensive depending on what evidence the furnisher already possesses. For instance, a debt buyer with account-level documentation or more comprehensive warranties from its predecessor debt buyer might be in a completely different position than

Midland.

(emphasis added) Id. at 1303. "When a furnisher reports that disputed information has been verified, the question of whether the furnisher behaved reasonably will turn on whether the furnisher acquired sufficient evidence to support the conclusion that the information was true. This is a factual question, and it will normally be reserved for trial." Id. However, the analysis does not stop there. The Court goes on to explain that a furnisher has two other options besides reporting that information is verified. This analysis has been cited approvingly against Defendant in this case and others. See Ponder v. Ocwen Loan Servicing, LLC, No. 1:16-CV-4125-ODE-LTW, 2018 WL 4474635, at *4 (N.D. Ga. July 30, 2018), report and recommendation adopted in part, overruled in part, 362 F. Supp. 3d 1275 (N.D. Ga. 2018); see also Hill v. Ocwen Loan Servicing, LLC, 369 F. Supp. 3d 1324 (N.D. Ga. 2019).

The question of what constitutes a "reasonable investigation" into a disputed debt under the FCRA is very fact dependent, and requires an investigation into whether the investigation is being conducted by a credit reporting agency or a furnisher of information such as Defendant. Id. at 1302. Additionally, the court may consider the status of the furnisher as an original creditor, a collection agency collecting on behalf of the original creditor, a debt buyer, or a down-the-line buyer, and on the quality of documentation available to the furnisher:

> We emphasize that what constitutes a "reasonable investigation" will
> vary depending on the circumstances of the case and whether the

investigation is being conducted by a CRA under § 1681i(a), or a furnisher of information under § 1681s–2(b). *See Chiang*, 595 F.3d at 38 ("[W]hat is a reasonable investigation by a furnisher may vary depending on the circumstances."); *Gorman*, 584 F.3d at 1160 ("[T]he reasonableness of an investigation depends on the facts of the particular case ...."). Whether a furnisher's investigation is reasonable will depend in part on the status of the furnisher—as an original creditor, a collection agency collecting on behalf of the original creditor, a debt buyer, or a down-the-line buyer—and on the quality of documentation available to the furnisher. *See, e.g.*, *Johnson*, 357 F.3d at 431 (reasoning that a jury could find a § 1681s–2(b) violation where the original creditor ended its investigation before **"consult[ing] underlying documents such as account applications"**). The facts of this case require us to determine whether a reasonable jury could find that Midland—a down-the-line buyer with "as is" purchase agreements and no account-level documentation—fell short of the reasonable investigation standard when it relied on internal records to verify the identity of an alleged debtor.

(emphasis added) Id. The Eleventh Circuit instructs an FCRA plaintiff to seek out information regarding the quality of the documentation available to the furnisher, the status of the furnisher, and all the facts surrounding its action will indicate that relying only on internal records to verify account information in a credit report is adequate to verify that information to a Credit Reporting Agency.

  b.  Plaintiff's Subpoena seeks documents related to whether Defendant willfully violated the FCRA.

Defendant's Fifth Defense is seemingly targeted at overcoming the willfulness requirement for a finding of punitive damages. It states that "…any representations or statements alleged to have been made by Ocwen were true and accurate at the time made and/or otherwise were made in **good faith and with a**

**reasonable belief as to their validity and accuracy and with reasonable belief that all Ocwen's conduct was lawful**." (emphasis added) (Doc. 73, p. 32). As described in depth above, any belief by Ocwen that it had accurate records without verifying could not be sincere, especially given that "[t]he examination of Litton also revealed that, prior to Ocwen's acquisition of Litton, members of Litton's information technology staff falsified documents provided to the Department during the review of Litton's information technology infrastructure." Ex. B, p. 3.

> c.  <u>Plaintiff seeks documents relevant to Defendant's asserted defenses regarding the question of whether it is a "Debt Collector".</u>

Because Defendant asserts that it is not a debt collector, Mr. Ponder must investigate the question of Ocwen's acquisition of Litton to determine whether Ocwen acquired the debt from Litton while treating it as in default, or whether Ocwen merged with Litton, and—prior to that—whether Litton acquired the loan in default.

> For an entity that did not originate the debt in question but acquired it and attempts to collect on it, that entity is either a creditor or a debt collector depending on the default status of the debt at the time it was acquired. The same is true of a loan servicer, which can either stand in the shoes of a creditor or become a debt collector, depending on whether the debt was assigned for servicing before the default or alleged default occurred.

<u>Bridge v. Ocwen Fed. Bank, FSB</u>, 681 F.3d 355, 359 (6th Cir. 2012); see also <u>Id.</u> at 361 ("we find disingenuous Ocwen Bank's argument that 'Ocwen also is not a debt

collector because servicing transferred to Ocwen on May 1, 2002, and Plaintiffs themselves allege that the account was not in default at that time.'").

Defendant's Eleventh Defense is that "Plaintiff's FDCPA claims are barred to the extent that Ocwen is not a 'debt collector' under the FDCPA." (Doc. 73, p. 33). Defendant's Twelfth Defense is that "Plaintiff's FDCPA claims are barred to the extent that Ocwen is a 'creditor' under the FDCPA." (Doc. 73, p. 33). In support of his claim that Defendant is a debt collector, Mr. Ponder seeks to prove that Defendant Ocwen obtained its interest in the Account after Plaintiff's alleged default. (Doc. 53 ¶ 13).

      d.  <u>Subpoenaed documents relate to whether Defendant has a pattern and practice of transgressing RESPA.</u>

The subject subpoena seeks monitor reports that explore Defendant's pattern and practice of RESPA violations. In order to recover statutory damages, the plaintiff must show "a pattern or practice of noncompliance." See <u>Miranda v. Ocwen Loan Servicing, LLC</u>, 148 F. Supp. 3d 1349, 1355–56 (S.D. Fla. 2015), quoting 12 U.S.C. § 2605(f)(1)(B).

> "Pattern or practice" is not defined by a specific number of offenses; rather, the term suggests a standard or routine way of operating… failure to respond to one QWR did not amount to "pattern or practice" ... (finding defendant's insufficient response to two QWRs insufficient to establish "pattern or practice")… (failure to respond to QWRs on five occasions was sufficient to establish "pattern or practice").

(internal citations omitted) Id. As described more fully above, a multistate examination of Ocwen identified deficiencies in Ocwen's servicing platform and loss mitigation infrastructure, including robo-signing, inaccurate affidavits and failure to properly validate document execution processes, missing documentation and failure to properly maintain books and records. Ex. B, p. 3. Further, the Monitor Reports, starting in 2014, and extending through at least 2017, monitored Ocwen's operations and provide a picture of whether there is a pattern and practice of the behavior to which Mr. Ponder was treated. Ex. B, p. 12. Further, the Monitors were charged with reviewing the Ocwen borrower experience, and "whether Ocwen is treating borrowers fairly and is communicating with borrowers appropriately". Ex. B, pp. 12-13. The full scope of what is contained in these Monitor Reports can only be ascertained from reviewing them but is described *supra*.

     e.  <u>Discovery that Plaintiff seeks relates to Plaintiff's claim for punitive damages under the FCRA.</u>

Mr. Ponder is seeking the subject documents which, ac Ocwen's willfulness under *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47 (2007); *see also Levine v. World Fin. Network Nat'l Bank*, 554 F.3d 1314, 1318 (11th Cir. 2009). In *Levine*, the Eleventh Circuit actually just restated the Supreme Court's *Safeco* standard. *Id.* It has been held that the Safeco standard actually reduces the Plaintiff's willfulness burden:

> *Safeco* changed the standard previously applied in the Fifth Circuit, pursuant to which a defendant could have been found in willful noncompliance under § 1692n only if it " 'knowingly and intentionally committed an act in conscious disregard for the rights of others.' " *Stevenson v. TRW Inc.,* 987 F.2d 288, 293-94 (5th Cir.1993) (quoting *Pinner v. Schmidt,* 805 F.2d 1258, 1263 (5th Cir.1986), cert. denied, 483 U.S. 1022 (1987)); *see also Harris v. Defendant 3 Info. Servs., LLC,* No. C A 606CV-01810-GRA, 2007 WL 1862826, at *2 (D.S.C. June 26, 2007) ("In Safeco, the Supreme Court unequivocally resolved this circuit split, holding that willfulness under 15 U.S.C. § 1681n(a) covers a violation committed in reckless disregard of Plaintiff's rights.").

Robertson v. J.C. Penney Co., Inc., No. 2:06CV3-KS-MTP, 2008 WL 623397, at *9 (S.D. Miss. Mar. 4, 2008).  While in many circuits, the courts had previously required "knowing or conscious disregard," Dalton v. Capital Assoc.  Indus., Inc., 257 F.3d 409, 418 (4th Cir. 2001), or even "willful concealment," Cousin v. Trans Union Corp., 246 F.3d 359, 372 (5th Cir. 2001), the post-Safeco standard included "recklessness."  *Levine*, 554 F.3d at 1318.  Plaintiff is entitled to evidence that establishes Ocwen's level of recklessness or willfulness in its disregard of Plaintiff's rights under the FCRA. Ocwen, with notice of ongoing problems with information technology systems and personnel, including with respect to record keeping and borrower communications, number of personnel and the training and expertise of its personnel in all servicing operations, the onboarding process for newly acquired mortgage servicing rights, which is serious inflection point in this case because Ocwen's onboarding of Mr. Ponder's loan has led it to assume the veracity of the Litton information, and any information regarding the inadequacies of Ocwen's

onboarding process prior to 2014 will directly relate to the question of whether Ocwen is and was aware that it is willfully parroting Litton's false records. Ex. B, p. 12. Many of the same information that will support Mr. Ponder's RESPA statutory damages pattern and practice claim will support his punitive damages claim, but—further—the Monitor Reports purport to be extremely thorough, and to the extend that they put Ocwen on notice of its systematic failures and inadequate policies and procedures, staffing, etc., these reports made Ocwen's illegal treatment of Mr. Ponder willful.

> f. <u>The Subpoena seeks evidence related to many of Defendant's defenses, as discussed supra in addition to the following.</u>

Defendant's Fourth Defense is that "Plaintiff's claims are barred because any alleged violation by Ocwen was unintentional, bona fide, and resulted notwithstanding Ocwen's maintenance of procedures reasonably adapted to avoid any such violation." (Doc. 73, p. 31). Obviously the review of the adequacy of Ocwen's procedures leading up to this litigation is relevant to Defendant's Fourth Defense.

Defendant's Twentieth Defense is that "[a]t all relevant times, Ocwen maintained and followed reasonable procedures to avoid violations of the FCRA and assure maximum possible accuracy of the information concerning Plaintiff in furnishing information related to Plaintiff." (Doc. 73, p. 34). Clearly, the review of

the adequacy of Ocwen's policies leading up to this litigation is relevant to Defendant's Twentieth Defense.

Defendant's Ninth Defense is that "Plaintiff's damages are the result of the conduct of another, not the result of any wrongdoing on the part of Ocwen." (Doc. 73, p. 32). The information related to the transition from Litton to Ocwen can shed light on whether Mr. Ponder's damages are more the result of Litton's actions or Ocwen's actions.

### IV. Ocwen Seeks to Assert Other's Privilege's to Quash the Subpoena but has no standing to do so.

#### a. Defendant cannot assert the privilege of the NYSDFS.

The NYSDFS has chosen not to object to this subpoena, and Ocwen cannot assert another's privilege. "The law governing courts in the Eleventh Circuit… is… [that] standing exists if the party alleges a 'personal right or privilege' with respect to the subpoenas." Auto-Owners Ins. Co. v. Se. Floating Docks, Inc., 231 F.R.D. 426, 429 (M.D. Fla. 2005). Defendant has not asserted a personal privilege with respect to the materials, and has not pursued its prior objections argument besides relevance and attempting to assert another's privilege.

Ocwen has made this argument before to no avail, and provides this Court no reason to disagree with the Eastern District of Texas or the Eastern District of New York. See United States ex rel. Fisher v. Ocwen Loan Servicing, LLC, No. 4:12-

CV-543, 2015 WL 3942900, at *3 (E.D. Tex. June 26, 2015). New York & Georgia

Law does not preclude disclosure of the documents.

> Federal Rule of Evidence 501 provides that the "common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege" unless federal law provides otherwise. Rule 501 also makes it clear that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision."

Id. at *3. Ocwen had no expectancy that these records would not be disclosed in

subsequent consumer litigation. See Id. at *5.

Federal Common Law does not form a justification for a protective order. The

federal common law bank examination would not apply, even if Defendant could

assert it.

> The federal banking privilege is "a discretionary one that depends upon ad hoc considerations of competing policy claims." *Rouson ex. rel. Estate of Rouson v. Eicoff,* No. 04–CV–2734, 2006 WL 2927161, at *4 (E.D.N.Y. Oct. 11, 2006). "The Court must weigh the government's interest in nondisclosure against those of the litigants and society in 'accurate judicial fact finding.' " *Id.* The Court should consider the following factors: (1) "the relevance of the evidence sought to be protected"; (2) "the availability of other evidence ..."; (3) "the 'seriousness' of the litigation and the issues involved ..."; (4) "the role of the government in the litigation ..."; and (5) "the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *Id.* The NYDFS has not attempted to conduct this analysis, and the Court finds that even if it were to conduct that analysis, it would lead the Court to the conclusion that the privilege should not apply to highly relevant documents in a FCA case, as the Court similarly concluded in its analysis *supra*.

<u>United States ex rel. Fisher v. Ocwen Loan Servicing, LLC</u>, No. 4:12-CV-543, 2015 WL 3942900, at *5 (E.D. Tex. June 26, 2015). Similarly, Defendant has not attempted to conduct the above-described analysis, and it is unlikely that it could form a justification to exclude evidence that is directly on point to Mr. Ponder's FCRA, RESPA, and FDCPA claims.

## <u>CONCLUSION</u>

Defendant having failed to show irrelevance or that Defendant has a privilege to assert, its motion should be denied, including the suggestion that this Court should somehow limit Mr. Ponder's subpoena.

Respectfully submitted, this 17th day of May, 2019.

 /s/ Orion G. Webb
Orion G. Webb
Georgia Bar No. 479611
Smith Welch Webb & White, LLC
280 Country Club Drive #300
Stockbridge, Georgia 30281
(770) 389-4864 (telephone)
(770) 389-5193 (facsimile)
owebb@smithwelchlaw.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

**SMITH WELCH WEBB & WHITE, LLC**

/s/ Orion Gregory Webb
Orion Gregory Webb
Georgia Bar No. 479611
280 Country Club Drive, Suite 300
Stockbridge, GA 30281
Telephone: (770) 389-4864
owebb@smithwelchlaw.com
**COUNSEL FOR PLAINTIFF**

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 5.1

Plaintiff's counsel hereby certifies that this pleading has been prepared with one of the font and point selections approved by the Court in L.R. 5.1.